## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION
## CIVIL ACTION NO. 5:14-CV-00182

KSA ENTERPRISES, INC., *et al.*,                                              Plaintiffs,

v.

BRANCH BANKING & TRUST COMPANY,                                      Defendant.

### MEMORANDUM OPINION AND ORDER

After a lengthy and seemingly positive lending relationship fell apart, KSA Enterprises, Inc., and Pain Management Resources, P.S.C., filed this lawsuit against Branch Banking & Trust Company. (Compl., ECF No. 1.) According to KSA, BB&T breached its contractual obligations under, and otherwise defrauded KSA during, a series of commercial loan transactions from 2003 to 2011. (*Id.* ¶¶ 39–69.) BB&T moves to dismiss what it considers to be nothing more than a case of borrower's remorse. (Def.'s Motion to Dismiss, ECF No. 7.) The Court has considered the arguments of both parties. (Def.'s Mem. of Law in Supp. of Mot. to Dismiss, ECF No. 7-1; Pls.' Resp. in Opp. to Mot. to Dismiss, ECF No. 10; Def.'s Reply in Supp. of Mot. to Dismiss, ECF No. 11.) Because KSA's lawsuit plausibly states claims for fraud and unjust enrichment, BB&T's Motion to Dismiss (ECF No. 7) is **GRANTED IN PART** and **DENIED IN PART**.

### I.

### A.

Beginning in 2003, KSA Enterprises, Inc., and Pain Management Resources, P.S.C., entered into a series of commercial lending transactions with Branch Banking & Trust Company. (*See* Compl. ¶¶ 7–17.) KSA needed a lender and BB&T a lendee, and the relationship proceeded without a hitch—at least at first.

1

In October 2005, KSA executed Loan Agreements 9580414394-00006 and -00008. (*Id.* ¶¶ 9–10.) "Exhibit A" defined the term "cash flow" in the "coverage provision" of each Loan Agreement. (*Id.* ¶ 22.) While the text of the Loan Agreements incorporated Exhibit A by reference, BB&T failed to attach Exhibit A to either Loan Agreement at the time of execution, and KSA had no opportunity to inspect it. (*Id.* ¶ 21.) However, according to KSA, BB&T represented that the definition of "cash flow" in Exhibit A "would not subtract owner withdrawals, dividends, or advances to stockholders." (*Id.* ¶ 20.) In reality, Exhibit A said no such thing: According to Exhibit A, "cash flow" meant net profits less "owner withdrawals, dividends, or advances to shareholders." (*Id.* ¶ 22.)

Subsequently, between July 2007 and July 2009, KSA and BB&T executed three more Loan Agreements. (*Id.* ¶¶ 13, 15, 17.) Loan Agreements 9580414394-00011 and 9580268797-00002 made no effort to define the term "cash flow" in the coverage provisions. (*See id.* ¶ 23.) However, Loan Agreement 9580414394-00015 defined "cash flow" as net profits less "owner withdrawals, dividends, or advances to shareholders"—in other words, in the same manner as Exhibit A. (*See id.*) Regardless, KSA alleges that it was unaware, (*id.* ¶ 38), and for more than seven years, the parties enjoyed an amicable relationship.

In August 2010, KSA approached BB&T to discuss refinancing the existing loans at lower interest rates so as to better approximate then-prevailing market rates. (*Id.* ¶ 24.) According to KSA, BB&T said that it would consider that possibility, (*id.* ¶¶ 25, 45, 54), and so KSA delayed seeking alternative financing from other lenders, (*id.* ¶ 35). For little more than one year, BB&T allegedly told KSA that it was working on the refinancing and was committed to refinance the loans at lower interest rates. (*See id.* ¶¶ 25, 45, 54.)

In September 2011, Amaju Stoner, a BB&T representative, met with KSA's principal, Dr. Laxmaiah Manchikanti, to further discuss the status of the loans. (*Id.* ¶ 26.) During that meeting, KSA says, Stoner told Dr. Manchikanti that BB&T wouldn't be able to refinance the loans unless KSA changed its business practices or provided additional guarantors. (*Id.* ¶ 27.) Stoner purportedly characterized KSA's loans as "problem loans" and suggested that Dr. Manchikanti seek refinancing with another lender. (*Id.*)

According to KSA, however, BB&T never intended to refinance the loans at any time between August 2010 and September 2011. (*Id.* ¶ 25). In addition, BB&T charged KSA for legal and appraisal fees associated with the refinancing process, even though BB&T otherwise never intended to follow through with the transaction. (*Id.* ¶ 34.) And despite KSA paying the bill, BB&T refused to provide KSA with copies of the appraisals, KSA's requests for the same notwithstanding. (*Id.*)

KSA's relationship with BB&T deteriorated after the September 2011 meeting. Stoner and other BB&T representatives informed Dr. Manchikanti that the loans were or would be placed in default. (*Id.* ¶¶ 29, 46, 55.) However, it appears uncontested that BB&T neither declared the loans in default, nor resorted to any remedy specified under the Loan Agreements in the event of default. (*Id.* ¶¶ 18, 28.) Meanwhile, KSA refinanced the loans with a different lender, (*id.* ¶ 32), triggering prepayment penalty clauses in many of the Loan Agreements, (*id.* ¶ 33).

In October 2013, after KSA had refinanced its loans with a different lender, Dr. Manchikanti met with Mark Thomas, Senior Vice President of BB&T, who provided Dr. Manchikanti with files showing BB&T's coverage provision calculations for September 30, 2010; December 31, 2010; and September 30, 2011. (*Id.* ¶ 36.) Those figures revealed that KSA

hadn't satisfied the coverage provision. (*Id.* ¶ 37.) KSA asserts it was not until that meeting that it discovered BB&T's alleged misrepresentation as to how "cash flow" would be calculated under the coverage provisions in the numerous Loan Agreements executed over the prior eight years. (*Id.* ¶ 38).

**B.**

This lawsuit against BB&T followed on September 26, 2014, alleging breach of contract vis-à-vis the implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, fraud in the inducement, and unjust enrichment. KSA also seeks punitive damages. Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), BB&T moves to dismiss KSA's suit in its entirety. The Court will discuss the legal standards involved and, then, turn to the parties' respective arguments.

**II.**

**A.**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss under Civil Rule 12(b)(6), a party must "plead enough 'factual matter' to raise a 'plausible' inference of wrongdoing." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Should the well-pleaded facts support no "more than the mere possibility of misconduct," then dismissal is warranted. *Id.* at 679. The Court may grant a motion to dismiss "only if, after drawing all reasonable inferences from the

allegations in the complaint in favor of the plaintiff, the complaint still fails to allege a plausible theory of relief." *Garceau v. City of Flint*, 572 F. App'x 369, 371 (6th Cir. 2014) (citing *Iqbal*, 556 U.S. at 677–79).

**B.**

To plead a claim sounding in fraud requires a bit more. Civil Rule 9(b) imposes a heightened pleading standard: A complaint must state the facts constituting the fraud with particularity. Fed. R. Civ. P. 9(b); *see Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011). Accordingly, the plaintiff "must generally (1) specify the time, place, and content of the alleged misrepresentation; (2) identify the fraudulent scheme and the fraudulent intent of the defendant; and (3) describe the injury resulting from the fraud." *SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 358 (6th Cir. 2014) (citing *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008)). The purposes animating Civil Rule 9(b) are "(1) to alert defendants to the particulars of the allegations against them so they can intelligently respond; (2) to prevent 'fishing expeditions'; (3) to protect defendants' reputations against fraud allegations; and (4) to whittle down potentially wide-ranging discovery to only relevant matters." *Id.* (citing *Chesbrough*, 655 F.3d at 466–67).

**III.**

**A.**

To support its breach of contract claim, KSA must allege sufficient facts to establish the existence of "the contract, the breach, and . . . the loss or damage by reason of the breach." *Fannin v. Commercial Credit Corp.*, 249 S.W.2d 826, 827 (Ky. 1952); *accord Shane v. Bunzl Distrib. USA, Inc.*, 200 F. App'x 397, 402 (6th Cir. 2006). KSA's claim clears the first hurdle: The various Loan Agreements between it and BB&T qualify as enforceable contracts. (*See*

5

Compl. ¶¶ 7–17.) But KSA's claim "stalls at the next element." *Mountain Motorsports Paving & Constr. LLC v. Yamaha Motor Corp., U.S.A.*, Civ. No. 14-76-ART, 2014 WL 5341865, at *4 (E.D. Ky. Oct. 20, 2014) (Thapar, J.). KSA objects to a number of BB&T's actions, but it "does not actually point to specific contractual provisions that prohibit the conduct." *Id.* A basic rule of Kentucky contract law is that a breach must implicate some "duty imposed by the contract." *Strong v. Louisville & Nashville R. Co.*, 43 S.W.2d 11, 13 (Ky. 1931). Therefore, KSA's claim is dismissed to the extent that it relies on a breach of any express provision in the various Loan Agreements.

B.

That notwithstanding, KSA's contract claim also relies on the covenant of good faith and fair dealing implied in all contracts—or, in this case, the various Loan Agreements. (*See* Compl. ¶ 40.) The "covenant of good faith is an obligation [owed] by both parties, and breach of the covenant can be the basis of a viable breach of contract claim." *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 196 (6th Cir. 2015) (citing *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F. Supp. 2d 807, 816–17 (E.D. Ky. 2013)). KSA needn't show that BB&T breached any specific provision of the Loan Agreements to succeed under an implied duty of good faith and fair dealing theory. *O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x 451, 457–58 (6th Cir. 2005). Instead, KSA must show that BB&T "acted in bad faith in denying [it] the benefits intended" by the Loan Agreements. *Gresh v. Waste Servs. of Am., Inc.*, 311 F. App'x 766, 776 (6th Cir. 2009) (citing *Farmers Bank & Tr. Co. of Georgetown v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005); *Ligon v. Parr*, 471 S.W.2d 1, 2–3 (Ky. 1971); *O'Kentucky Rose*, 147 F. App'x at 457–58). KSA must point to some action (or inaction) on BB&T's part that kept it from reaping the fruits of its bargain or otherwise exercising its

contractual rights.  *See Crestwood Farm Bloodstock v. Everest Stables, Inc.*, 751 F.3d 434, 445 (6th Cir. 2014) (citing *Odem Realty Co. v. Dyer*, 45 S.W.2d 838, 839–40 (Ky. 1932)).

BB&T breached that covenant, says KSA, through an improper "course of conduct designed to maximize BB&T's gain under the subject loans." (Pls.' Resp. at 1.)  The Court will address each factual allegation in turn.  But even accepting KSA's allegations as true—which, in this context, the Court must—BB&T has not breached the implied covenant.

### 1.

First, KSA alleges that BB&T misrepresented the definition of "cash flow" in the coverage provision at the time the parties executed the various Loan Agreements. (Compl. ¶ 38.) But the implied covenant of good faith and fair dealing "only applies to the *performance* or *enforcement* of a contract," not to its *formation*. *McMullin v. McMullin*, 338 S.W.3d 315, 323 (Ky. Ct. App. 2011) (emphasis added) (citing *Farmers Bank*, 171 S.W.3d at 11; *RAM Eng'g & Constr., Inc. v. Univ. of Louisville*, 127 S.W.3d 579, 585 (Ky. 2003)); *see also* Restatement (Second) of Contracts § 205 cmt. c (observing that the covenant "does not deal with good faith in the formation of a contract").  That is so because the "contract and the obligation of good faith originate concurrently." *RAM Eng'g*, 127 S.W.3d at 585.  Therefore, misrepresenting the definition of "cash flow" alone does not constitute a breach of the implied covenant.

### 2.

KSA further points to statements that BB&T was considering refinancing KSA's loans when, in fact, it never intended to do so. (*See, e.g.*, Compl. ¶ 25.)  To be sure, a party may breach its implied obligations vis-à-vis providing false assurances. *See Gresh*, 311 F. App'x at 776–77 (concluding that a "false assurance that no sale was imminent" supported a breach of

7

"the common-law duty of good faith" because the statement deprived an option-holder of the opportunity to exercise the option "while it was worth something"). But that is not the case here.

The reason is simple enough: While KSA need not show that BB&T breached any specific provision in the Loan Agreements, it must point out how BB&T's false statements kept it from reaping the fruits of its bargain or otherwise exercising its contractual rights. *Crestwood Farm*, 751 F.3d at 445. As BB&T correctly argues, its alleged false statements breached no obligation implied in the various Loan Agreements. (Def.'s Reply at 5–6.) The Loan Agreements did not obligate BB&T to refinance the loans, nor has KSA alleged "that future refinancing was somehow part of the 'benefit of the bargain originally intended.'" (*Id.* at 3–4.) The Loan Agreements merely obligated BB&T to loan KSA a sum certain and required KSA to repay that sum (with interest) over a period of years. That BB&T did, and KSA agrees.[1]

As to KSA's contract claim, then, BB&T's allegedly false statements about refinancing either related to the formation of a new contract or, perhaps, a modification of the existing Loan Agreements. If the former, there was no breach insofar as there was no contractual obligation. *See RAM Eng'g*, 127 S.W.3d at 585 ("[T]he contract and the obligation of good faith originate concurrently."). So too with the latter. The implied covenant "only applies to the *performance or enforcement* of a contract," not to a renegotiation of its terms. *McMullin*, 338 S.W.3d at 323

---

[1] KSA's contract claim relies almost exclusively on *Bank of America, N.A. v. Corporex Realty & Investment, LLC*, 875 F. Supp. 2d 689 (E.D. Ky. 2012). In *Corporex*, a guarantor counterclaimed against the borrower's bank alleging, *inter alia*, a breach of the covenant of good faith and fair dealing implied in various promissory notes. *Id.* at 692, 699–700. According to the guarantor, the bank told it to "hold-off" on refinancing the notes with other lenders and encouraged it to negotiate with the bank, *id.* at 694–95, even though the bank "never intended to modify or extend" the borrower's loans, *id.* at 700. Instead, after the borrower defaulted on the notes, the bank ceased negotiations, accelerated the notes, and demanded immediate payment. *Id.* at 695. By coaxing the borrower and guarantor into default, the bank just so happened to render the guarantor's "contractual right of first refusal to buy the notes at a substantial discount" a nullity. *Id.* at 700. It should come as no surprise, then, that the district court concluded that the guarantor had stated a claim for breach of the implied covenant.
  But *Corporex* is far-afield from the facts alleged here. Unlike the bank's falsehoods in *Corporex*, BB&T's false promises about its intent to refinance the loans neither "interfered with [KSA's] ability to perform the contract," nor prohibited it "from exercising [a] contractual right" anywhere in the Loan Agreements. *Id.* Therefore, KSA's reliance on *Corporex* is misplaced.

(emphasis added).  Therefore, even if BB&T "reneged on an oral promise to modify the terms of the loan[s], that would not be enough to support a claim under the implied covenant of good faith and fair dealing."  *Resolution Tr. Corp. v. Lesal Assocs.*, No. 91 CIV. 2025 (MBM), 1992 WL 98843, at *5 (S.D.N.Y. May 6, 1992).

### 3.

KSA also takes issue with BB&T's refusal to provide copies of the appraisals that BB&T generated while supposedly considering KSA's refinancing proposal.  (Compl. ¶ 34.)  Again, KSA makes no allegation that those appraisals qualify as fruits of its bargain or that it was unable to exercise its contractual rights without them.  *See Crestwood Farm*, 751 F.3d at 445.  Even if true, there is no breach of the implied covenant.

### C.

### 1.

In addition to its contract claim, KSA brings a claim sounding in fraud.  (Compl. ¶¶ 42–50.)  In order to state a cause of action for fraud, KSA must allege (1) that BB&T made a material representation to it, (2) that the representation was false, (3) that BB&T knew of its falsity or made it recklessly, (4) that BB&T induced KSA to act on the representation, (5) that KSA reasonably relied on the representation, and (6) that the misrepresentation caused KSA to suffer some injury.  *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (citing *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464 (Ky. 1999)); *accord C.A.F. & Assocs., LLC v. Portage, Inc.*, 913 F. Supp. 2d 333, 353 (W.D. Ky. 2012).  KSA must also plead the circumstances constituting the fraud with particularity in accordance with Civil Rule 9(b).  While an exceedingly close question, KSA has plausibly stated a claim for fraud which might entitle it to some relief and has done so with the particularity required.

The following allegations plausibly state such a claim: In August 2010, KSA inquired about refinancing its loans with BB&T. (Compl. ¶ 24.) BB&T's representatives responded favorably and assured KSA of its then-present intent to refinance the loans. (*Id.* ¶¶ 25, 45, 54.) In point of fact, BB&T had no such intent. (*Id.* ¶ 25.) Meanwhile, relying on BB&T's false assurances, KSA forewent refinancing opportunities at lower interest rates elsewhere. (*Id.* ¶¶ 25, 49.) But after KSA pressed the issue in September 2011, BB&T made clear its unwillingness to refinance KSA's loans and suggested it look to other lenders. (*Id.* ¶ 27.) KSA did just that, but not before BB&T charged KSA for legal and appraisal fees supposedly related to KSA's earlier requests to refinance. (*Id.* ¶¶ 34, 50.) Yet when KSA requested copies of those appraisals, BB&T persistently refused to provide them. (*Id.* ¶ 34.) Viewed in the light most favorable to KSA, these allegations plausibly state a claim sounding in fraud—if only just by a hair.

### 2.

#### a.

Under well-established Kentucky law, BB&T argues, "fraud cannot be predicated upon statements which are promissory in their nature when made and which relate to future actions or conduct." *Mario's Pizzeria, Inc. v. Fed. Sign & Signal Corp.*, 379 S.W.2d 736, 740 (Ky. 1964) (quoting 23 Am. Jur. *Fraud and Deceit* § 38 (internal quotation marks omitted)). BB&T submits that any statements about refinancing come within the ambit of that rule. (*See* Def.'s Mem. at 22–23.)

True enough, to be actionable, "a misrepresentation . . . must be made concerning a present or pre-existing fact, and not in respect to a promise to perform in the future." *Filbeck v. Coomer*, 182 S.W.2d 641, 643 (Ky. 1944) (citing *Ky. Elec. Dev. Co.'s Receiver v. Head*, 68 S.W.2d 1, 2 (Ky. 1934); *Campbell Cty. v. Braun*, 174 S.W.2d 1, 2 (1943)). But no rule is

10

without exception, or at least without caveat: For when someone makes a representation knowing that he has no intention of carrying it out, an action for fraud will lie. *See PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 613–14 (Ky. Ct. App. 2011) (collecting cases); *accord Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 253 (6th Cir. 2012). BB&T's statements about refinancing (as alleged) fall into that category. (*See* Compl. ¶ 25 ("BB&T told [KSA] that [it was] considering the request to refinance the loans. BB&T never had any intention to refinance the loans."); *see also* Pls.' Resp. at 10.) BB&T's alleged statements are plausibly actionable.

### b.

BB&T also asserts that KSA hasn't suffered any injury on account of BB&T's allegedly false assurances about refinancing. (*See* Def.'s Reply at 12.) KSA's only pecuniary losses are "the interest rates . . . [that KSA] contractually agreed to pay." (*Id.*) As BB&T sees it, the mere "fact that [KSA] might obtain a lower interest rate or more favorable loan terms from another lender does not . . . somehow equate to fraud damages." (*Id.*) Respectfully, the Court sees things in a different light.

"The fundamental rule in assessing damages for fraud is that the victim of fraud is entitled to compensation for every wrong which was the natural and proximate result of the fraud." *Sanders, Inc. v. Chesmotel Lodge, Inc.*, 300 S.W.2d 239, 241 (Ky. 1957) (citing 24 Am. Jur. *Fraud and Deceit* § 226); *accord Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 56 F.3d 726, 735 (6th Cir. 1995). In other words, KSA is "entitled to recover as damages . . . [its] pecuniary loss . . . of which the misrepresentation is the legal clause," including the "pecuniary loss suffered otherwise as a consequence of [KSA's] reliance upon the misrepresentation." *Gibson v. Ky. Farm Bureau Mut. Ins. Co.*, 328 S.W.3d 195, 204 (Ky. Ct. App. 2010), *as*

11

*modified* (Dec. 3, 2010) (quoting Restatement (Second) of Torts § 549 (1977 & Supp. 2010)) (internal quotation marks omitted).

In this action, KSA has alleged that, but for BB&T's false statements, it would have sought and been able to obtain refinancing with a different lender at an earlier date and on more favorable terms. (Compl. ¶ 35.) Relying on BB&T's false statements, it did not. (*Id.*) Accepting those allegations as true, BB&T's alleged statements induced KSA to forego earlier opportunities to refinance at interest rates lower than its current arrangement with BB&T, (*id.* ¶ 49), and a jury could perhaps award "the difference between these two figures as compensatory damages," *Rickert*, 996 S.W.2d at 470. BB&T has brought no contrary authority to the Court's attention. Until such a time, the Court will allow KSA's fraud claim to proceed.[2]

### 3.

KSA also asserts that BB&T misrepresented—either intentionally or negligently—the status of the loans. (Compl. ¶¶ 30–32, 46, 55.) The Court cannot say, however, that these statements plausibly state a claim for fraud or negligent misrepresentation. In the main, the Court is unable to discern what, if any, damages resulted from BB&T's allegedly false statements about the loans' status. KSA's sole injury relates to the costs of its detrimental reliance "on the false statements of BB&T regarding refinancing of the loans." (*Id.* ¶¶ 49–50, 58–59.) KSA does not plead with sufficient particularity or plausibility damages resulting from BB&T's alleged threats of default.

KSA tries to clear things up in its Response, but in doing so encounters other problems. For example, KSA suggests that BB&T's threats of default induced it to refinance with a different lender, causing KSA to pay BB&T certain prepayment penalty fees. (Pls.' Resp. at 10.)

---

[2] In light of the Court's conclusion that KSA plausibly states a claim sounding in fraud, it will not dismiss KSA's request for punitive damages. (*See* Pls.' Resp. at 13.)

Even so, KSA has not alleged the necessary connection between BB&T's false statements, KSA's decision to refinance, and its payment of the prepayment penalty fees. According to KSA, it fully intended to refinance the loans in August 2010. (*See* Compl. ¶ 24.) In fact, the viable portion of KSA's fraud count depends on the allegation that BB&T improperly delayed those refinancing efforts. But BB&T's threats of default began more than a year later—in September 2011. (*See id.* ¶¶ 26–27, 32–33.) KSA has not plausibly explained the connection between BB&T's statements and its decision to refinance because KSA already planned on doing just that. *Cf. Romanoff v. Balcom*, 339 N.E.2d 927, 927 (Mass. App. Ct. 1976) ("No claim is stated for deceit or negligent misrepresentation because the plaintiff made the loan prior to the alleged misrepresentation and could not have relied on the representation." (citations omitted)). Therefore, KSA has not stated a plausible claim for fraud or negligent misrepresentation premised on BB&T's alleged threats of default.

### D.

As an alternative theory to its common law fraud claim, KSA alleges that BB&T negligently misrepresented its then-existing intent to refinance the loans at more favorable rates. (Compl. ¶ 54.) It is true that Kentucky recognizes the tort of negligent misrepresentation, and holds

> liable for pecuniary loss a person who (1) in the course of his business or in a transaction in which he has a pecuniary interest, (2) supplies false information for the guidance of others in their business transaction, if (3) he fails to exercise reasonable care or competence in obtaining or communicating the information and (4) the plaintiff justifiably relied on the information.

*Republic Bank & Tr. Co. v. Bear, Stearns & Co.*, 707 F. Supp. 2d 702, 713 (W.D. Ky. 2010) (citing *Presnell Constr. Mangers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 580 (Ky. 2004); Restatement (Second) of Torts § 552(1)), *aff'd*, 683 F.3d 239. Unlike fraudulent misrepresentation, however, "a party's intent to perform a promise or agreement *cannot* form the

13

basis of a negligent misrepresentation claim." *PCR Contractors*, 354 S.W.3d at 619 (emphasis added). That rule rests on sound logical footing: The nature of BB&T's alleged promise to consider refinancing KSA's loans is such that BB&T either knew at the time that it had no intention of fulfilling it, or intended to fulfill the promise fully; in either event, it didn't make the statement carelessly. *Id.* Accordingly, KSA's negligent misrepresentation claim fails as a matter of law and must be dismissed.

### E.

In addition, KSA claims that BB&T fraudulently induced it to execute the various Loan Agreements by falsely representing that it would calculate KSA's "cash flow" without subtracting "owner withdrawals, dividends, or advances to stockholders." (Compl. ¶ 61.) BB&T responds—and the Court agrees—that KSA has not identified any pecuniary loss as a result of those representations. (*See* Def.'s Mem. at 26–27, 29 & n.10.) Likewise, KSA has not alleged, at least with any measure of particularity, that there remain outstanding loan agreements between it and BB&T otherwise subject to remedy. Therefore, the Court dismisses KSA's fraudulent inducement claim.

### F.

KSA's final count is for unjust enrichment. (Compl. ¶¶ 63–66.) For KSA to prevail under an unjust enrichment theory, it must prove three elements: "(1) [a] benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009) (citing *Guarantee Elec. Co. v. Big Rivers Elec. Corp.*, 669 F. Supp. 1371, 1380–81 (W.D. Ky. 1987)). KSA alleges that BB&T's false statements about refinancing induced it to pay BB&T above-market interest rates, which provided BB&T with a benefit it

wouldn't otherwise have enjoyed had KSA refinanced the loans with a different lender. If obtained by fraud, BB&T's retention of the funds would be unjust. *See Griffin v. Jones*, 975 F. Supp. 2d 711, 726–27 (W.D. Ky. 2013). In the context of BB&T's Motion to Dismiss, these facts plausibly allege a claim for unjust enrichment.

### IV.

For the reasons discussed above, and being otherwise sufficiently advised;

**IT IS HEREBY ORDERED** that BB&T's Motion to Dismiss (ECF No. 7) is **GRANTED IN PART** as to Counts I, III, and IV in KSA's Complaint (ECF No. 1) and **DENIED IN PART** as to Counts II, V, and VI.

**IT IS SO ORDERED.**

Date:

cc:     Counsel of Record