UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:14-CV-00182-GNS-LLK


KSA ENTERPRISES, INC., et al.                                    PLAINTIFFS


v.


BRANCH BANKING & TRUST COMPANY                                    DEFENDANT


## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant's Motion to Strike Plaintiffs' Jury

Demand (DN 48), Defendant's Motion for Summary Judgment (DN 68), and Defendant's

Motion to Exclude Plaintiffs' Expert Witness (DN 83). For the following reasons, Defendant's

Motion for Summary Judgment is **GRANTED**, and Defendant's Motion to Strike Plaintiffs' Jury

Demand and Defendant's Motion to Exclude Plaintiffs' Expert Witness are **DENIED AS**

**MOOT**.


## I.      BACKGROUND

Between 2003 and 2010, a series of eleven commercial loans totaling $11 million were

made by Defendant Branch Banking & Trust Company ("BB&T") to Plaintiffs KSA Enterprises,

Inc. ("KSA"), and Pain Management Resources, P.S.C. ("PMR") (collectively "Plaintiffs").

(Def.'s Mot. Summ. J. Exs. 4-14, DN 68-5 to 68-15). Dr. Laxmaiah Manchikanti

("Manchikanti"), Plaintiffs' principal, entered into the loan agreements on Plaintiffs' behalf.

(Def.'s Mot. Summ. J. Exs. 4-14). Manchikanti and Steve Hawkins ("Hawkins"), an accountant

for Plaintiffs, served as points of contact with BB&T on all matters associated with the lending

relationship. (Manchikanti Dep. 37:22-38:14, Aug. 24, 2016, DN 68-3). During the relevant

period, Randle Hendon ("Hendon"), a loan officer at BB&T's Paducah branch, served as Plaintiffs' main contact at BB&T. (Hendon Dep. 33:5-35:13, Aug. 23, 2016, DN 68-16; Thomas Dep. 16:15-17:3, Oct. 27, 2016, DN 64).

In 2010, Manchikanti asked Hendon to look into options for reducing Plaintiffs' interest rates by refinancing or consolidating Plaintiffs' loans. (Manchikanti Dep. 64:12-15, 67:12-21, 74:13-16; Hawkins Dep. 77:18-22, Aug. 24, 2016, DN 68-15). At some pointed during 2010, Hendon offered Plaintiffs a potential refinancing option for lowering their interest rates. (Manchikanti Dep. 68:4-25). Hendon spoke with a senior credit officer about the refinance request and the pair ran "through some of the numbers on what [they] thought [they] might be able to do." (Hendon Dep. 40:24-42:8). A proposal was developed that included a lower interest rates for Plaintiffs, if they were willing to pay some amount equal to roughly half of the interest that would accrue in the following year. (Manchikanti Dep. 65:22-66:6; Hawkins Dep. 83:20-84:22). Manchikanti rejected the proposal. (Manchikanti Dep. 68:14-18; Hawkins Dep. 85:8-17; Hendon Dep. 43:25-44:16).

Subsequently, Manchikanti again inquired into whether BB&T would consolidate or refinance his loans and on February 1, 2011, Hendon responded indicating that he thought BB&T "[would] be able to do something." (Def.'s Mot. Summ. J. Ex. 17, at 1, DN 68-18 [hereinafter Emails]). Hendon stated that he would prepare a package to enable a regional loan administrator to review the refinance request. (Emails 1). In a series of e-mails throughout February and March 2011, Hendon told Plaintiffs that the refinance request was being prepared for review by BB&T. (Emails 1-5). On February 14, 2011, Hendon told Hawkins he would be the first to know when additional information was received about "what [it would] take" to come up with other potential refinancing options. (Emails 2). In a follow-up email later that month,

Hendon apologized for the delay and explained that, because of the size of Plaintiffs' loans, additional information and more thorough analysis was needed. (Emails 3).

On March 14, 2011, BB&T completed an internal "Loan Review Summary" assessing the status of Plaintiffs' loans and the parties' overall lending relationship. (Def.'s Mot. Summ. J. Ex. 1, DN 68-2 [hereinafter Loan Review Summary]). As part of the Loan Review Summary, BB&T prepared a "Global Financial Analysis" assessing the overall financial status and performance of Plaintiffs' and Manchikanti's various other companies, as well as that of Manchikanti and his wife, individually. (Loan Review Summary 6-7). In the Global Financial Analysis, BB&T expressed concern about Plaintiffs' financial status because of identified weaknesses in Manchikanti's businesses. (Loan Review Summary 6-7). As a result of these concerns, the Loan Review Summary recommended a downgrade of Plaintiffs' lending relationship to a "risk grade 7." (Loan Review Summary 8).

When one or more loans has a "total business exposure" of over $1 million and receives a risk grade of 7 or higher, it is classified internally as a "problem loan" and placed on a watch list. (Thomas Dep. 56:5-7; Thomas Decl. 4-5, DN 65). Under the terms of BB&T's Problem Loan Management Policy, "[d]ue to the high level of risk, [BB&T's] exposure strategy for Watch List clients [was] either "decrease" or "out." (Def.'s Mot. Summ. J. Ex. 20, at 5, DN 67). Still, Mark Thomas, BB&T's Rule 30(b)(6) deponent, testified that a classification as a problem loan did not foreclose the possibility that BB&T would refinance Plaintiffs' existing loans. (Thomas Dep. 90:22-93:16, 95:14-96:4; Def.'s Mot. Summ. J. Ex. 18, ¶¶ 6-8, DN 68-19). According to Thomas, if BB&T determines that a refinance is appropriate in view of the attendant risk and exposure it can do so even if a loan has been classified as a problem or watch list loan. (Thomas Dep. 92:2-4, 93:8-94:22; Thomas Decl. ¶¶ 6-8). Further, BB&T's policies contemplate the idea

of modifying a risk grade 7 loan, as the policy requires "co-approval by the appropriate Credit Officer, Loan Administrator and/or Special Assets Officer" to modify loans in this category. (Def.'s Mot. Summ. J. Ex. 19, at 9-10, DN 66).

After the Loan Review Summary was released BB&T's credit officer, Warren Takacs ("Takacs"), notified Hendon that he had completed his review of Plaintiffs' relationship package. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. 1, at 8, DN 75). Takacs sent comments which he directed Hendon to use during conversations with Plaintiffs prior to the Problem Loan Administration Asset Manager's involvement. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. 1, at 8). Takacs stated "[i]t's not the most enjoyable part of our roles to see a client's financial stress issues result in classified loans for us, but to provide good client service and adhere our values we have to call it like we see it and help Dr. M to help himself out of harm's way." (Pls.' Resp. Def.'s Mot. Summ. J. Ex. 1, at 8). Comments included in a "Commercial Loan Review Risk Summary" apparently prepared by Takacs in late March 2011, indicated that BB&T should "provide the financial counsel that [Plaintiffs'] non-core businesses and their debts should be reduced or liquidated before the problem grows larger." (Pls.' Resp. Def.'s Mot. Summ. J. Ex. 1, at 9).

On March 30, 2011, Hendon met with Hawkins and provided him with a portion of the Loan Review Summary. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. 1, at 8). Hendon asked Hawkins for more information regarding Plaintiffs' and Manchikanti's finances, and Hawkins requested time to obtain this information. (Emails 6). Later, Hawkins informed BB&T by letter that the Manchikantis' 2010 personal tax returns would not be available until sometime in June and that their personal financial statement would not be completed until sometime before the end of July 2011. (Def.'s Mot. Summ. J. Ex. 21, at 3, DN 68-22 [hereinafter Hawkins Letter]). Hawkins's letter stated:

We have to be able to substantiate ongoing cash flow sufficient to meet the needs of the various Dr. M. owned companies, as well as Dr. M. personal debt and living expenses. Currently, we have too many unanswered questions to provide a sufficient level of comfort that Dr. M can sustain what is already outstanding. Of primary concern currently is the [fast-food restaurants'] performance.

(Hawkins Letter 3).

Hawkins thereafter contacted Hendon on May 10, 2011, to check on the status of the "credit review/request." (Emails 7). Hendon responded that he would let Hawkins know when he received any further information. (Emails 7-8). Hawkins followed up in June and again asked about the status of the "credit/refi review." (Emails 10). Hendon answered that he had experienced some technical problems with his email and apologized for the lengthy review process. (Emails 10-11). On June 30, 2011, Hendon emailed Manchikanti to apologize that he had not been able to prepare a financing proposal for another unrelated transaction involving the purchase of a fast-food restaurant in Louisville. (Emails 12). Hendon said the loan review seemed to be taking too long and would be "pushing even harder" to move things forward now that BB&T had added another regional loan specialist. (Emails 12).

Hendon reached out to Kim Patterson, a portfolio manager at BB&T, to discuss the status of Manchikanti's loan review. (Emails 13-16). Melanie Ranburger, another portfolio manager, reminded Hendon that BB&T was still waiting to receive Manchikanti's personal tax returns before it could proceed with the loan review. (Emails 17). On August 2, 2011, BB&T again requested Plaintiffs' 2010 financial documentation to assess the loans. (Emails 18).

In September of 2011, Ajamu Stoner ("Stoner"), a "problem loan administrator" with BB&T, met with Manchikanti to discuss the loans. (Emails 20-21). Stoner explained BB&T's concerns about the loans and revealed to Manchikanti that the loans were classified as "problem loans." (Manchikanti Dep. 195:5-13, 122:12-19). Manchikanti decided in early October 2011 to

refine Plaintiffs' loans with another lender. (Manchikanti Dep. 127:24-128:5). In July 2012, Plaintiffs refinanced most of their loans with Community Financial Services Bank ("CFSB"). (Manchikanti Dep. 129:21-22). At that time, CFSB had hired Hendon, who worked directly with Manchikanti to refinance his loans at CFSB, and Hendon still has an ongoing business relationship with Manchikanti at CFSB. (Manchikanti Dep. 129:23-130:25).

Plaintiffs brought this action initially asserting claims of breach of contract, fraud, negligent misrepresentation, fraud in the inducement, unjust enrichment, and punitive damages. (Compl., DN 1). On September 23, 2015, this Court issued an Order dismissing Plaintiffs' claims for breach of contract, fraud in the inducement, and negligent misrepresentation, as well as narrowing Plaintiffs' claims for fraud and unjust enrichment. (Mem. Op. & Order 15, DN 13).[1] BB&T now moves for summary judgment of Plaintiffs' remaining claims. (Def.'s Mot. Summ. J., DN 68). Thus, this matter is ripe for adjudication.

## II.  JURISDICTION

The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000.00.

---

[1] The theory on which this Court allowed Plaintiffs' fraud claim to proceed is thus:

> [T]o be actionable, "a misrepresentation . . . must be made concerning a present or pre-existing fact, and not in respect to a promise to perform in the future." But no rule is without exception, or at least without caveat: For when someone makes a representation knowing that he has no intention of carrying it out, an action for fraud will lie. B B & T's statements about refinancing (as alleged) fall into that category. B B & T's alleged statements are plausibly actionable.

(Mem. Op. & Order 10-11 (internal citations omitted)).

### III. STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

### IV. DISCUSSION

#### A. Plaintiffs' fraud claim fails as a matter of law

Under Kentucky law, an action for fraudulent misrepresentation requires six elements: "(a) a material misrepresentation, (b) which is false, (c) known to be false or made recklessly, (d) made with inducement to be acted upon, (e) acted in reliance thereon, and (f) causing injury."

*Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky. App. 1978) (citation omitted);

*accord United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). Claims alleging

fraud must be proven by clear and convincing evidence. *Norwich v. Norwich*, 459 S.W.3d 889,

899 (Ky. 2015) (citing *Hardin v. Savageau*, 906 S.W.2d 356, 357 (Ky. 1995)). Because fraud

entails a heightened burden of proof, the party alleging fraud "must show in opposition to the

motion for summary judgment that he can produce evidence which, if believed, will meet the

higher standard." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 428 F. Supp. 2d 675, 682 (E.D. Ky.

2006) (internal quotation marks omitted) (quoting *White v. Turfway Park Racing Ass'n*, 909 F.2d

941, 944 (6th Cir. 1990)).

Under well-established Kentucky law, "fraud cannot be predicated upon statements

which are promissory in their nature when made and which relate to future actions or conduct."

*Mario's Pizzeria, Inc. v. Fed. Sign & Signal Corp.*, 379 S.W.2d 736, 740 (Ky. 1964) (internal

quotation marks omitted) (quoting 23 Am. Jur. *Fraud and Deceit* § 38 (internal quotation marks

omitted)). Kentucky courts, however, recognize a "deception" exception to the general rule

where a representation either incorporates falsified past or present facts or is so contrary to the

true current state of affairs that the purported prediction is an obvious sham. *Flegles, Inc. v.

TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009). Kentucky courts have applied this exception

"when a deliberately false opinion is expressed or when a promise is made with the present intent

of a future breach, or with no intention of carrying out the promise or declaration of future

expectations . . . ." *Edward Brockhaus & Co. v. Gilson*, 92 S.W.2d 830, 835 (Ky. 1936)

(statement about future listing of stock would be fraud absent purpose or expectation to list).

This Court's prior order held that Plaintiffs' fraud claim survived BB&T's motion to

dismiss because it potentially fit into this narrow exception. (Mem. Op. & Order 15). Thus, the

Court allowed Plaintiffs' fraud claim to proceed on the theory that BB&T "assured [Plaintiffs] of its then-present intent to refinance the loans . . . [when] BB&T had no such intent . . . [and] relying on BB&T's false assurances, [Plaintiffs] forewent financing opportunities at lower interest rates elsewhere." (Mem. Op. & Order 10 (citation omitted)). The Court will evaluate whether there are specific facts in the record present to create a genuine issue of material fact for this case to proceed to trial. *See* Fed. R. Civ. P. 56(c)(1).

1. ***There is sufficient evidence to show that BB&T made material representations to Plaintiffs through its agent.***

To support a claim for fraud, a plaintiff must first show that a defendant made a material representation. To prove that a material representation was made, the plaintiff must proffer record evidence that is more than "vague generalizations with no specific proof." *Burklow v. Baskin-Robbins USA, Co.*, 274 F. Supp. 2d 899, 908 (W.D. Ky. 2003) (holding that the plaintiff's fraud claim failed as a matter of law because the record was devoid of any specific proof that defendant ever made a material misrepresentation). BB&T argues that Plaintiffs have failed to identify any specific representations by Hendon, other than stating he would "look into" refinancing options, which BB&T contends is too vague to constitute a material representation. (Def.'s Mot. Summ. J. 15).

The Court disagrees and finds that there is specific record evidence that Hendon made several material representations to Plaintiffs. Hendon represented to Manchikanti that BB&T would "look into" his request to refinance or consolidate Plaintiffs' loans to lower the interest rate. (Manchikanti Dep. 64:12-15, 67:12-21, 74:13-16). Further, the evidence shows that on numerous occasions Hendon represented that BB&T was currently reviewing the request to refinance or consolidate the loans and that options, "good, bad, or ugly" would be presented to Plaintiffs in the future. (Emails 10). Specifically, on February 1, 2011, Hendon emailed

Hawkins indicating that he thought BB&T "would be able to do something" regarding the request to refinance or consolidate and stated that Hendon was preparing a package for the Regional Loan Administrator to review Plaintiffs' request. In emails dated February 14, and February 23, 2011, Hendon informed Hawkins that he was underwriting the request and "mov[ing] it on up the line" for further review. (Emails 2-3). On May 10, 2011, and June 9, 2011, Hendon again represented that the refinance request was being reviewed. (Emails 8, 10). On June 30, 2011, Hendon stated that the review was still ongoing and was taking too long; he blamed the lengthy refinance review process on travel and understaffing. (Emails 12). Viewing the facts most favorably for Plaintiffs, this correspondence demonstrates clearly that Hendon made specific representations to Plaintiffs that their refinance request was being considered by BB&T.[2]

Nonetheless, it is important to note that BB&T's material representations were that BB&T *would consider* Plaintiffs' refinance request. There is no evidence in the record that BB&T ever promised it would offer Plaintiffs options to lower their interest rates.

> **2.** ***Plaintiffs have not proffered clear and convincing evidence that BB&T made the material representations with the present intention not to refinance or consolidate Plaintiffs' loans.***

Because Plaintiffs' fraud claim deals with a future promise, Plaintiffs must demonstrate that BB&T made the material representation that it would consider refinancing Plaintiffs' loans while not intending to so. *See Edward Brockhaus & Co.*, 92 S.W.2d at 835. Viewing the facts most favorable to Plaintiffs, the Court holds that no reasonable juror could conclude by clear and

---

[2] Additionally, BB&T argues that Plaintiffs' Complaint fails to meet the heightened pleading standard for fraud laid out in Federal Rule of Civil Procedure 9(b). (Def.'s Mot. Summ. J. 15-16). This Court previously held that Plaintiffs' fraud claim was sufficiently plead and survived BB&T's motion to dismiss. (Mem. Op. & Order 9-12). Thus, the Court will not revisit BB&T's argument that Plaintiffs have failed to meet Rule 9(b)'s heightened pleading standard.

convincing evidence that BB&T never intended to consider Plaintiffs' request. Plaintiffs rely heavily on the fact that risk grade 7 loans, like Manchikanti's, are placed on a "watch list" by BB&T and given an exposure strategy of "decrease" or "out." (Def.'s Mot. Summ. J. Ex. 20, at 5). Further, Plaintiffs contend that because their file was sent to the "Problem Loan Department" for review, BB&T no longer intended to consider a request to refinance. (Pls.' Resp. Def.'s Mot. Summ. J. 15, DN 73 [hereinafter Pls.' Resp.]). According to Plaintiffs, these actions demonstrate that BB&T clearly had no intention to consider modifying Plaintiffs' loans. (Pls.' Resp. 14).

Plaintiffs' contentions are refuted by evidence in the record. Mark Thomas, a Problem Loan Administration Group Leader for BB&T, testified that even if a loans exposure strategy is classified as "decrease" or "out," the possibility of a refinance, or loan consolidation, is not completely foreclosed. (Thomas Dep. 90:22-93:16, 95:14-96:4; Thomas Decl. ¶¶ 6-8). Thomas testified that if BB&T determines that a refinance is appropriate in view of the attendant risk and exposure, it can certainly do so, even if a loan has been classified as a problem or watch list loan. (Thomas Dep. 92:2-4, 93:8-94:22; Thomas Decl. ¶¶ 6-8). Thus, the evidence does not support Plaintiffs' contention that BB&T never intended to consider refinancing its loans to Plaintiffs contrary to Hendon's representations. *See SMA Portfolio Owner, LLC v. Corporex Realty & Inv., LLC*, 112 F. Supp. 3d 555, 572 (E.D. Ky. 2015), *aff'd sub nom. Bank of Am., N.A. v. Corporex Realty & Inv. Corp.*, 661 F. App'x 305 (6th Cir. 2016) (after analyzing the elements of fraud under Kentucky law, the court concluded "that no reasonable jury could reach the conclusion that 'out' designation meant [Bank of America] had no intention to modify the loans" because a BOA employee testified that Bank of America was still allowed to modify loans under the designation of an "out" exit strategy).

Additionally, BB&T's points out that its risk grade policy specifically contemplates the possibility of a refinance for risk grade 7 loans. (Def.'s Mot. Summ. J. Ex. 20, at 9-10). The policy provides that "[a]ny new loans and all renewals/modifications of existing loans to borrowers in this risk grade require co-approval by the appropriate Credit Officer, Loan Administrator and/or Special Assets Officer regardless of the loan authority of the Account Officer." (Def.'s Mot. Summ. J. Ex. 20, at 9-10). Thomas also testified that "problem loans" are not precluded from possible refinancing. (Thomas Decl. ¶ 8 ("BB&T internal policies and procedures do not prohibit BB&T from refinancing a problem loan.")). Therefore, the designation of Plaintiffs' loans as a "grade 7" and "problem loans" did not foreclose the possibility that BB&T could have refinanced Plaintiffs' loans, and thus, the evidence does not show that BB&T had no intention to refinance or consolidate Plaintiffs' loans.

Plaintiffs aver that even if BB&T still could have refinanced Plaintiffs' loans, evidence of the Loan Review Summary indicates that BB&T had no intention of doing so. After the Loan Review Risk Summary of Plaintiffs' loans were completed, Takacs indicated in an email to Hendon that Hendon "needed to help Dr. M out of harms [sic] way." (Pls.' Resp. Def.'s Mot. Summ. J. Ex. 1, at 8). Additionally, the Loan Review Risk Summary stated that BB&T "need[ed] to provide financial counsel that [Plaintiffs] non-core businesses and their debts should be reduced or liquidated before the problem grows larger." (Pls.' Resp. Def.'s Mot. Summ. J. Ex. 1, at 8). Thus, according to Plaintiffs, after the Loan Review Summary was released in March 2011, every representation made by BB&T that it was continually working on options for Manchikanti was made with the knowledge that BB&T was no longer considering this option.

Takacs' comments in the Loan Review Summary do not rebut the fact that BB&T could have still refinanced or modified Plaintiffs' loans. In fact, those comments reflect BB&T's belief

that Plaintiffs' business interests needed to be rearranged or modified. Although this evidence indicates that Takacs believed Manchikanti's financial status to be shaky, it is not evidence that BB&T had no intention to considering refinancing the loans. Hendon specifically testified that he believed a remedy of the "out" designation was to refinance loans to decrease exposure. (Hendon Dep. 137:22-138:3). In fact, Manchikanti's refinance request was on hold because BB&T was still waiting on financial documents from Manchikanti to complete the loan review. In July 2011, Hendon reached out to Kim Patterson, a portfolio manager, to discuss the status of Manchikanti's loan review. (Emails 13-16). Melanie Ranburger, another portfolio manager, reminded Hendon that BB&T was still waiting to receive Manchikanti's personal tax returns to proceed with the loan review. The loan review certainly would not have been necessary if BB&T had no intent to still consider Manchikanti's request. (Emails 17). Thus, the Court concludes that no reasonable juror could reach the conclusion that BB&T made a promise to review Manchikanti's request with the present intent to never do so.

3.    ***Assuming arguendo that BB&T never intended to refinance Plaintiffs' loans, Plaintiffs have not shown by clear and convincing evidence that Hendon was aware of BB&T's intention.***

Even if Plaintiffs were able to demonstrate that Hendon's superiors at BB&T had no intention of refinancing of consolidating the loans, Plaintiffs have not shown that Hendon was aware of this fact. Plaintiffs argue that whether Hendon was aware that BB&T had no intention of refinancing Plaintiffs' loans when he made the representations that BB&T would consider doing so is immaterial because the intention of BB&T is imputed to him through the concept of corporate collective intent. (Pls.' Resp. 20-24). The Court has found no Kentucky or Sixth Circuit cases applying the concept of collective corporate intent to cases involving common-law

fraud.  To support its argument, Plaintiffs rely on cases where courts use the theory of institutional intent to allocate liability in securities fraud charges.[3]

Kentucky law recognizes basic principles of agency law that a corporation is liable for the actions of its agents when the alleged conduct falls within the scope of the agent's employment.  "[W]hile the knowledge of the agent is imputed to the principal, the converse is not true." *Schmitt v. FMA All.*, 398 F.3d 995, 997 (8th Cir. 2005) (citation omitted).  *See also Stanley v. Deluxe Fin. Servs. Inc.*, No. 1:08-CV-2149, 2009 WL 929029, at *20-21 n.2 (N.D. Ohio Apr. 2, 2009) ("While it is fundamental agency law that an agent's knowledge is imputed to his principal, the opposite is not true. The principal's knowledge is not imputed to the agent."). With these principles in mind, BB&T argues that there is no evidence to establish that Hendon knew BB&T would not consider refinancing Plaintiffs' loans when he represented that it would, therefore, Hendon fully intended that BB&T would consider doing so he made the representations.  (Def.'s Reply Mot. Summ. J. 9, DN 79).

Accordingly, the issue before the Court is whether Hendon was aware that BB&T had no intention of refinancing or consolidating Plaintiffs' loans when he represented that BB&T was

---

[3] Assuming that cases involving securities fraud would even apply, it is notable that the concept of collective corporate intent has been explicitly narrowed by the Sixth Circuit as a basis for corporate liability in securities fraud cases.  As that court has explained:

> [O]ur formulation protects corporations from liability . . . when one individual unknowingly makes a false statement that another individual, unrelated to the preparation or issuance of the statement, knew to be false or misleading.  *By allowing courts to examine only the states of mind of lower-level employees connected to the statements, our formulation prevents plaintiffs from abusing the broad dicta in City of Monroe . . . .*

*In re Omnicare, Inc. Securities Litigation*, 769 F.3d 455, 477 (6th Cir. 2014) (emphasis added). Contrary to the "collective intent" principle urged by Plaintiffs (and even assuming case law addressing corporate liability in the securities fraud context would apply here), *Omnicare* demonstrates conclusively that courts must look to the knowledge and intent of the individual employee who made the allegedly fraudulent statement.

reviewing Plaintiffs' refinance request. Certainly there is evidence in the record to demonstrate that when Hendon first made the statements to Plaintiffs that BB&T would consider options to refinance Plaintiffs' loans, he had no knowledge that his superiors at BB&T did not intend to do so. The record shows that Hendon prepared a package for the Regional Loan Administrator to look at and "move[d] it up the line" at he indicated to Plaintiffs. (Emails 1, 3). Furthermore, Hendon did offer Plaintiffs a proposal to refinance, albeit with interest costs, which was summarily rejected. (Manchikanti Dep. 68:4-25).

Plaintiffs argue that the situation changed after the Loan Review Summary Risk Analysis was issued in March 2011. The Loan Review Summary Risk Analysis was emailed to Hendon on March 30, 2011. The Loan Review Summary Risk Analysis indicated that Plaintiffs' loans' risk grade had been downgraded to a risk grade of 7, meaning BB&T's categorical strategy for the loans was either "decrease" or "out." (Loan Review Summary 8). Nevertheless, as discussed above, BB&T's corporate representative testified that BB&T can, and does, stray from this policy and that it did consider refinancing loans on the "watch list." (Thomas Dep. 90:22-93:16, 95:14-96:4; Thomas Decl. ¶¶ 6-8). Furthermore, Hendon testified that he believed that risk grade 7 loans with an exposure strategy of "decrease" or "out" could still be refinanced and that testimony is unrefuted. (Hendon Dep. 137:22-134:3). The downgrade of Plaintiffs' loan risk alone does not establish that Hendon was aware that BB&T had no intention of considering Plaintiffs' refinance request.

Plaintiffs point to an email from Takacs indicating that Hendon needed to "help Dr. M out of harms [sic] way" and the notes attached to the Loan Review Risk Summary which specified that Hendon "need[ed] to provide financial counsel that [Plaintiffs] non-core businesses and their debts should be reduced or liquidated before the problem grows larger." (Pls.' Resp.

Def.'s Mot. Summ. J. Ex. 1, at 8). According to Plaintiffs, this evidence demonstrates that Hendon possessed the requisite knowledge to deduce that BB&T had no intention of refinancing Plaintiffs' loans. (Pls.' Resp. 25). Although this evidence clearly shows that Hendon knew BB&T was concerned that Plaintiffs' loans were not in good health, these statements do not support the proposition that BB&T no longer intended to consider refinancing or consolidating Plaintiffs' loans at a lower interest rate.

Significantly, in July 2011, Hendon e-mailed a Regional Loan Administrator, Kim Patterson, and inquired into the status of Plaintiffs' loan review. (Emails 13-16). This evidence indicates that after he received the Loan Risk Summary Review, Hendon believed the refinance request was still being reviewed and considered by BB&T. Another portfolio manager replied that she was waiting for Manchikanti's 2010 personal tax return, which again reflects an ongoing evaluation as opposed to a determination not to refinance. (Emails 17).

In sum, Hendon testified that he did not state anything false or misleading to Plaintiffs. There is no evidence adduced by Plaintiffs showing that any of Hendon's representations were known by him to be false.[4] (Hendon Dep. 44:24-45:16, 76:10-13, 19-25, 77:1-2, 6, 110:21-111:14). Even viewing the facts most favorable to Plaintiffs, a reasonable jury could not conclude that there is clear and convincing evidence that even if BB&T had no intention to refinance Plaintiffs' loans, Hendon was aware of that fact.

> ### 4. *Plaintiffs have not proffered clear and convincing evidence that they reasonably relied on Hendon's representations.*

Under Kentucky law, to establish a fraud claim, a plaintiff's reliance upon a defendant's false representation must be reasonable or justifiable. *Flegles, Inc.*, 289 S.W.3d at 549 (citing

---

[4] It appears telling that Plaintiffs still use Hendon as their banker, which they would be unlikely to do if they believed that he had lied to them about BB&T's intent to refinance these loans.

Restatement (Second) of Torts § 537 (1977)).  "[E]quity will grant no relief to a complaining party who has means of knowledge of the truth or falsity of representations . . . ." *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1447 (6th Cir. 1993) (internal quotation marks omitted) (citation omitted).  "[A] plaintiff alleging fraud has a minimum duty to 'exercise some due diligence or perform at least some investigation into the factual basis of the representation, particularly where he possesses some relevant experience.'"  *Buridi v. Branch Banking & Tr. Co.*, 654 F. App'x 802, 805-06 (6th Cir. 2016) (citation omitted).

BB&T relies on *DePriest v. Hardymon*, 209 F. App'x 525 (6th Cir. 2006), for the proposition that Plaintiffs are sophisticated business parties who must exercise common sense and cannot rely blindly on the representations of those on the other side of the transaction.  *Id.* at 527-29.  In *DePriest*, the plaintiff, a sophisticated investor, purchased a large number of shares in a company which were later determined to be worthless. *Id.* at 527. The plaintiff sued alleging fraud in the transaction.  *Id.*  The Sixth Circuit held that the plaintiff's reliance on any alleged assurances about the soundness of his investment was not reasonable because he was a sophisticated investor who should have conducted due diligence instead of relying entirely on the defendants' statements.  *Id.* at 528-29.  The court further rejected the plaintiff's argument that his reliance was reasonable, in spite of his failure to complete his own review, because the parties on the other side of the transaction were sophisticated bankers and businessman "operating in a highly regulated industry."  *Id.* at 529 (internal quotation marks omitted).  According to the court, "[g]iven [the plaintiff's] knowledge of the secured-lending industry and his general sophistication in business matters, his total failure to investigate [the company's] financial condition render[ed] any reliance unreasonable."  *Id.*

Plaintiffs argue that although Manchikanti is a sophisticated party, he did not possess the knowledge or have access to the information required to determine the true state of affairs at BB&T. Thus, Plaintiffs argue that *DePriest* is distinguishable because the banking industry is highly regulated and Manchikanti does not have specific knowledge of the banking industry. (Pls.' Resp. 28). Accordingly, Plaintiffs contend that a reasonable jury could find that his reliance was reasonable, as an ordinary person would have no concern regarding the refinance request since Hendon continuously reassured that there were no issues with the request and Plaintiffs had no reason to disbelieve him. (Pls.' Resp. 28-29). Plaintiffs claim that all of BB&T's inquiries related to the loans were believed and represented to be in relation to the refinance request, and thus, there was no indication that there were any credit issues. (Pls.' Resp. 28-29). Regardless of Plaintiffs' knowledge of BB&T's issues with Plaintiffs' credit, Plaintiffs cannot show that their reliance was reasonable regarding Hendon's representations that BB&T was considering refinance of the loans.

First, the evidence in the record demonstrates that Manchikanti is an experienced businessman and investor who failed to engage in ordinary diligence in this instance. In addition to owning and running his own medical practice, Manchikanti has been involved in multiple business ventures over the past 30 years, including a surgery center, multiple restaurant chains, and real estate holding companies. (Manchikanti Dep. 17:8-20:19, 22:4-25:11). Manchikanti also utilizes professional advisers when making investment and business decisions, including a certified public accountant, Hawkins. (Manchikanti Dep. 26:4-12). It is undisputed that Manchikanti has broad experience when it comes to commercial lending.

Second, even being unaware that there were issues with BB&T's possible extension of additional credit, evidence in the record demonstrates that Plaintiffs were not justified in their

reliance on Hendon's assurances that Plaintiffs' refinance request was being reviewed, even if that had not been true. On March 25, 2011, Hendon indicated to Manchikanti that the refinance review would include review of his 2010 personal tax return and the 2010 tax information of the various corporate entities that were "projected to be ready by April 15." (Emails 4). After the Loan Risk Review Summary was completed using the 2009 and 2010 interim tax information, Hendon sent Hawkins a list of questions to answer with instructions to attach the 2010 tax information and financial statements of the various corporate entities and Manchikanti and his wife's personal statements. (Emails 6). Hawkins responded and stated that the current 2010 year-end tax returns and financial statements for the various corporate entities and Manchikanti individually were being worked on, and the individual tax returns of Manchikanti were expected to be completed at end of June and the personal financial statement for Manchikanti was expected to be completed by the end of July. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. A, at 66). When Hendon emailed the regional loan administrator to inquire as to the status of the review in June 2011, he was notified that the review was on hold because BB&T had still not received Manchikanti's 2010 personal tax return. (Emails 13). On August 2, 2011, the regional administrator again requested Plaintiffs to provide various financial documents and the personal tax returns of Manchikanti. and his wife, as BB&T had still not received them at this time. (Emails 18).

Plaintiffs claim that they are not sophisticated business entities in the field of banking; however, Plaintiffs were well aware that any refinance request would necessitate updated financial information, which they did not provide. Plaintiffs should have known that the refinance request could not be reviewed to completion without this information, yet they failed to provide updated financial reports as requested. It cannot be said that Plaintiffs justifiably relied

on Hendon's representations that BB&T was reviewing the refinance request when Plaintiffs withheld information necessary for the review to be completed.

There is no evidence that BB&T promised to modify Plaintiffs' loans to ensure a lower interest rate. BB&T only promised that it would look into options. Knowing that BB&T's options may be "good, bad, or ugly," Plaintiffs still did not shop around to other lenders to obtain a lower interest rate. (Emails 10). Because BB&T never promised to lower Plaintiffs' interest rate but only to consider Plaintiffs' request to do so, Plaintiffs cannot now argue that their reliance on BB&T's representations led them to forego refinancing at lower interest rates elsewhere. Plaintiffs have not provided probative evidence demonstrating a question of fact for trial regarding reasonable reliance—an essential element of a fraudulent misrepresentation claim. Accordingly, BB&T's motion for summary judgment on this claim must be granted.

### 5.    *Plaintiffs' Damages*

BB&T also contests Plaintiffs' claims for damages. BB&T argues that there is no evidence in the record to support a jury finding that another financial institution would have refinanced or consolidated Plaintiffs' loans at a lower interest rate. In this Court's prior order allowing Plaintiffs' fraud claims to proceed, Plaintiffs theory of damages was laid out as follows:

> In this action, KSA has alleged that, but for BB&T's false statements, it would have sought and been able to obtain refinancing with a different lender at an earlier date and on more favorable terms. Relying on BB&T's false statements, it did not. Accepting those allegations as true, BB&T's alleged statements induced KSA to forego earlier opportunities to refinance at interest rates lower than its current arrangement with BB&T, and a jury could perhaps award "the difference between these two figures as compensatory damages."

(Mem. Op. & Order 12 (internal citations omitted)). The only evidence of record on this point is the testimony of Plaintiffs' expert, Hawkins, who testified that Plaintiffs should have been able to receive a 4.5% interest rate during this time period from another lender. BB&T has moved to

exclude Hawkins' testimony as to the element of damages. This exclusion is not without consequence, because without Hawkins' testimony, there is simply no record evidence to support the proposition that Plaintiffs passed on opportunities to refinance at a lower interest rate because of BB&T's representations. Regardless, the Court finds that an analysis of this issue would be unnecessary, as Plaintiffs' fraud claim fails for the above discussed reasons. Therefore, BB&T's motion to exclude Hawkins testimony is moot.

### B.    Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law

In its prior Order, this Court found that Plaintiffs plausibly stated a claim for unjust enrichment by reasoning that if BB&T fraudulently obtained Plaintiffs' interest payments, its retention of the funds would be unjust and entitle Plaintiffs' to recover under the equitable theory of unjust. (Mem. Op. & Order 15 ("If obtained by fraud, BB&T's retention of the funds would be unjust." (internal citation omitted))). As demonstrated above, Plaintiffs have submitted no proof that BB&T fraudulently obtained any interest payments that Plaintiffs were contractually obligated to pay. Therefore, Plaintiffs unjust enrichment claim fails as a matter of law. *See Guerin v. Fulkerson*, 354 S.W.3d 161, 165 (Ky. App. 2011) (noting that the elements of unjust enrichment include "a resulting appreciation of benefit by defendant . . . ." (internal quotation marks omitted) (citing *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. App. 2009))).

### C.    Plaintiffs' Claim for Punitive Damages Fails as a Matter of Law

Considering none of Plaintiffs' substantive claims remain, Plaintiffs' claim for punitive damages must fail as well.

## V.    CONCLUSION

For the reasons discussed above, **IT IS HEREBY ORDERED**:

1.    Defendant's Motion for Summary Judgment (DN 68) is **GRANTED**;

2.      Defendant's Motion to Strike Plaintiffs' Jury Demand (DN 48) is **DENIED AS MOOT**.

3.      Defendant's Motion to Exclude Plaintiffs' Expert Witness (DN 83) is **DENIED AS MOOT**.

**Greg N. Stivers, Judge**
**United States District Court**
September 5, 2017

cc:      counsel of record